408 So.2d 63 (1981)
PASCO ENTERPRISES, INC. and Lawrence and Frazier, a Partnership
v.
The SOUTHLAND INSURANCE AGENCY, INC. and National Security Fire and Casualty Company.
No. 52959.
Supreme Court of Mississippi.
December 9, 1981.
Rehearing Denied January 20, 1982.
Shaddock & Dryden, George S. Shaddock, Pascagoula, for appellants.
Bryan, Nelson, Allen, Schroeder & Backstrom, Ernest R. Schroeder and John Banahan, Pascagoula, for appellees.
Before SMITH, P.J., and BROOM and HAWKINS, JJ.
HAWKINS, Justice, for the Court:
The plaintiffs, Pasco Enterprises, Inc., and Lawrence and Frazier, sued The Southland Insurance Agency, Inc., and the National Security Fire and Casualty Company in the circuit court of Jackson County. Following trial, the jury found in favor of National Security, but rendered a verdict for the plaintiffs against The Southland Insurance Agency in the amount of $75,000. Judgment was entered accordingly.
*64 Plaintiffs appeal, assigning as error that the verdict was against the overwhelming weight of the evidence and that conflicting instructions were given. National Security cross-appeals, assigning as error the refusal of the circuit judge to grant a directed verdict in its favor. Southland has not responded to the brief of either party.
The sole question to be determined on this appeal is whether National Security had any hazard insurance policy in effect covering plaintiffs' mobile homes when Hurricane Frederick struck Jackson County September 12, 1979. We hold that it did not, and affirm on both the direct and cross appeals.
National Security Fire and Casualty Company is an insurance corporation with principal offices in Elba, Alabama. Under the provisions of Mississippi Code Annotated Section 83-21-17 (1972) it held a certification as a nonadmitted insurer issued by the commissioner of insurance.[1]
The Southland Insurance Agency, Inc., was a local incorporated insurance agency operating out of Biloxi in 1978, and had been in business for several years. Initially, it was named the Bohanovich Agency and later called Continental Insurers. In 1976 the name was again changed to Continental-Sekul; in 1977, to Continental-Biloxi Insurance Agency; and in 1978, the name became The Southland Insurance Agency, Inc. At all times, apparently, it was a Mississippi corporation engaged in selling insurance as a local insurance agent for various insurance companies.
In 1977, Harvey Brooks acquired a part ownership in the agency and became its president. He had had many years of experience in the insurance business and had been employed by the agency since 1976.
Harold Lawrence and John D. Frazier are residents of Jackson County, and partners in the firm Lawrence and Frazier. They are also the principal shareholders and officers in Pasco Enterprises, Inc., a Mississippi corporation with principal offices in that county. Both Mr. Lawrence and Mr. Frazier had licenses to sell insurance which they had held for a number of years, and each had engaged in the insurance business as local agents.
The partnership firm and corporation owned a number of mobile homes in Jackson County which they rented out. Although they owned a few prior to 1976, they increased their ownership considerably that year, and secured hazard insurance for these homes through Continental-Sekul (later Southland). National Security issued eleven insurance policies covering twenty-three mobile homes through Continental-Sekul, for the period November 2, 1976 through November 2, 1977, the premiums therefor being paid by Lawrence and Frazier and Pasco through Continental-Sekul. The policies were renewed in 1977 by Pasco and Lawrence and Frazier again paying premiums through the local agency, Continental-Biloxi (later Southland). The yearly renewal was for November 2, 1977 through November 2, 1978. From time to time units would be added or deleted by endorsements to the policies, and fifty-one mobile homes were insured by National Security at the expiration date of November 2, 1978.
*65 Following its customary business policy, National Security, some 30 to 45 days prior to the due date of these policies, mailed plaintiffs notices of the due date of the policies, notifying them they would expire November 2. On November 2, 1978, National Security mailed plaintiffs eleven notices informing them that the policies had been terminated.
These notices are perforated, with the customer to keep the right half for his records and to return the left half to National Security. The faces of both halves give the termination date as November 2, 1978, the policy number, the quarterly premium, and the annual premium. The left sides of both list the "Agent/Broker" as "The Southland Ins. Agcy." National's copy very plainly begins with "MAKE CHECK PAYABLE TO:" and just below in larger, bolder lettering is printed: "NATIONAL SECURITY FIRE & CASUALTY COMPANY." Then, just below in smaller but plain print is "ELBA, ALABAMA 36323." The customer's half also gives the name and address of the insured.
On the customer's copy, just beneath the name and address of the company, is printed "TERMINATION & REINSTATEMENT NOTICE." Below this statement, is printed: "Payment Date to Reinstate 11/17/78." Additionally, in the center of the customer's copy, the notice states that:
Because the premium has not been received the policy numbered herein terminated as of the above termination date. Please disregard this notice if your check was recently forwarded.
See over for reinstatement offer.
On the reverse side of the customer's half of the notice is printed the following:
REINSTATEMENT OFFER
The Company offers to reinstate, without lapse, the policy which terminated, provided:
(1) payment of the premium stated on the other side of this OFFER is received at the home office of the Company on or before the payment date to reinstate
(2) a check shall be accepted as payment of premium only if honored on first presentation for payment, and
(3) if the Company has not received payment of said premium as specified above, the Termination Date on the other side of this OFFER shall be the end of the policy, without further notice to the named Insured.
The Company reserves the right to withdraw this offer at any time before payment is received at the home office. Withdrawal will be effective at the time notice thereof is mailed to the insured. Payment to a branch office or agent will not be considered payment to the home office of the company.
The company's half of the reverse side of the notice provided room to give the company notice of a change of address, beneath which was a place to date the notice and for the insured to sign.
When these notices were received by the plaintiffs, there had been no premium payment by them either to Southland or National Security, nor, was any payment transmitted to either Southland or National Security prior to November 17, 1978.
On November 29, 1978, Southland sent an invoice to Lawrence and Frazier for $3,118.00. Although a place was provided on the invoice for the policy number and presumably who the carrier was supposed to be, the only information typed on the invoice gave the effective date as "11/2/78" and expiration date as "11/2/79", and under Description was typed "Mobile Home."
On November 29, 1978, Southland likewise sent an invoice to Pasco for $3,619.00, which has typed thereon the same information as the invoice sent Lawrence and Frazier.
On November 30, 1978, plaintiffs mailed a check of the same date to Southland, payable to "The Southland Insurance Agency, Inc." in the amount of $6,737.00, the total of the two invoices.
On December 13, 1978, Southland wrote Mrs. Doris Kieper, secretary and bookkeeper for the plaintiffs, the following letter:

*66 Dear Doris,
Please find enclosed the list of insured Mobile Homes and their respective premiums per unit. I have circled the premium amount in the left hand column.
These premiums per unit are not exactly to the penny, because the total premium charge was computed on a schedule basis and not on a per unit figure. I used a different method of computation on the Lawrence and Frazier mobile homes because of the later models of homes on that schedule.
If you have any questions, please call.
 Sincerely
 (signed) Harvey Brooks
 President-Southland
 Insurance Agency
A handwritten list of fifty-six mobile homes was enclosed with this letter, giving the unit premium, year, make, serial number, size, and location of each. National Security was not listed as having been sent a copy of the letter; its name did not appear on the letter or the attached handwritten schedule.
On January 26, 1979, Mrs. Kieper wrote Brooks the following letter:
Dear Harvey:
Enclosed please find copy of all our mobile homes  the units underlined in red need to be insured, if you have not already done so. Do not insure the two units underlined in green.
I would appreciate confirmation in writing of the units underlined in red having been insured.
It should be noted that following November 2, 1978, there was no written or oral statement from Southland to plaintiffs that their insurance for the following year was with National Security, nor was any inquiry made by the plaintiffs of Southland as to whether or not they had insurance with National Security. Inquiries aplenty flowed, but apparently none to the specific question: has National Security issued coverage?
Southland never mailed any premium to National Security. There is no record of the $6,737.00 payment by plaintiffs going anywhere except to Southland. Upon repeated inquiries by Mrs. Kieper to Southland, she was orally assured by Brooks they had coverage. Plaintiffs never received any premium receipts from any insurance company, or any endorsements from any insurance company that these mobile homes were insured. There was no communication from plaintiffs to National Security or from Southland to National Security following the expiration notices mailed by National Security to plaintiffs and Southland on November 2, 1978, until some date following the storm on September 12, 1979, when plaintiffs' mobile homes were either destroyed or damaged. The record shows that following November 2, 1978, and prior to September 13, 1979, the only communications were between plaintiffs and Southland, and plaintiffs and inquiring lienholders on various mobile homes.
Notice of loss to Southland was duly given by plaintiffs, and Brooks sent an adjuster who made an appraisal. No payment was ever made, and plaintiffs through their attorney wrote National Security two letters requesting payment, without any reply.
This suit followed, resulting in a jury verdict in favor of plaintiffs against Southland for $75,000, but in favor of the defendant National Security.
Plaintiffs argue on their appeal that the trial judge erred in giving conflicting instructions. He instructed the jury that as a matter of law Southland was the agent of National Security, and also gave an instruction authorizing the jury to return a verdict in favor of National Security. We must reject this argument for two reasons, the first being that the plaintiffs did not object to any given instruction; secondly, the two instructions do not conflict. The jury was entitled to find, despite the fact that Southland was National Security's agent, that Southland did not have either actual or apparent authority to collect the premium due National Security in event plaintiffs wished to reinstate their policies.
*67 For the same reason we must find the verdict of the jury was not against the overwhelming weight of the evidence.
In this situation, payment to Southland had not been made before the termination notice was received by plaintiffs. Nor, do plaintiffs claim they were misled in any way by the notices received from National Security, or that they misunderstood the language in each. These notices plainly informed plaintiffs to make payments to National Security at its home office. They also stated payment to an agent would not be considered payment to the home office of the company. It would be somewhat difficult for plaintiffs to make such an assertion, since both Messrs. Lawrence and Frazier are licensed insurance agents themselves.
Plaintiffs duly received termination notices in November, 1978. Thereafter, they never received any premium receipt from any insurance carrier, and of course none from National Security. They never received any endorsements or renewal policies from any insurance carrier, including National Security, evidencing their having insurance following November 2, 1978.
Unfortunately for them, they relied completely and totally upon the oral assurances from Brooks and his agency, and did nothing further until the disastrous storm of September 12, 1979.
Under the provisions of each policy, they lapsed upon nonpayment of premiums, a provision common to most if not all insurance policies. This fact could not have been lost upon plaintiffs.
When the policies lapsed, they were no longer in force and effect. There was no coverage, and no further obligation existing between either National Security or plaintiffs to the other.
We must hold National Security had a right to provide that any reinstatement of these policies following November 2, 1978, could only be made by payment to it at its home office. This is basic contract law, which this Court cannot ignore. Plaintiffs had clear notice that no agent, which included Southland, had authority to collect a premium on behalf of National Security following November 2, 1978. Plaintiffs, therefore, at their own peril paid Southland. Southland remitted no premium to National Security on behalf of plaintiffs, nor apparently, to any other insurance carrier.
In Matheny v. Massachusetts Mutual Life Ins. Co., 235 So.2d 690 (Miss. 1970), we affirmed a chancery court's denial of coverage under a life insurance policy for nonpayment of premium, and payment of which had been made to a local agent following death of the insured. The policy provided:
Premiums are payable in advance. All premiums after the first are payable on their due dates at the Home Office or to an agent or cashier holding the Company's official receipt signed by the Secretary or an Assistant Secretary.
We stated:
In order to reinstate the policy on the life of Jordan, it was necessary for Matheny to tender to the home office or the Hughes general agency during the lifetime of Jordan the quarterly premium. This was made perfectly clear in the policy itself. This the appellants failed to do. (Emphasis added) Id. at 694.

In Kansas City Life Insurance Co. v. Root, 238 Ala. 412, 191 So. 219 (Ala. 1939), Mrs. Root made some payments to Mr. Pope, a local agent for a life insurance policy on her husband. Usually he remitted the payment, and had remitted payments from his own funds when she was delinquent. She paid him $3.50 to pay a premium, but he applied it to money she owed him for past premiums he had paid, and it was not forwarded to the company. The policy provided:
2. The first premium only may be paid to the agent. All subsequent premiums are due and payable in advance at the Home Office of the Company without notice. However, they may be paid to an authorized agent of the Company on or before the date when due, but only in exchange for a receipt signed by the *68 President, Vice-President, Secretary or Assistant Secretary, and countersigned by such agent.
The Alabama Supreme Court stated:
It is unquestionably the law that the contract restricted the payment of all premiums, except the initial one, to a certain authority and upon the issuance of an official receipt and excluded the authority of Pope, the soliciting agent, to collect same and, when the insured or beneficiary paid the same to Pope, they made him their agent to see that the payments reached the defendant insurance company.
* * * * * *
The plaintiff no doubt intended that the sum last paid by her was intended to go as a payment of the premium on the policy and not as a credit on what was due Pope, at least, the jury so found, but, when she made said Pope her agent to remit it to the defendant, she assumed the risk of his failure to send it in and, while this may be what is termed "a hard case," we must heed the admonition of the great and lamented Chief Justice Stone, "Let not hard cases make shipwreck of the law."
191 So. at 220.
There was no element of estoppel or waiver in this case following November 2, 1978. And, for more compelling reasons than in the above-cited cases, National Security in this case had the right to provide as a condition precedent to the reinstatement of any policy with it that the premium be received at the home office in Elba, Alabama. See Hawkins v. Graber, 198 N.E.2d 275 (Ohio Com.Pl. 1963); American Standard Life Ins. Co. v. Denwitty, 256 S.W.2d 864 (Tex.Civ.App. 1953); Carter v. Old Faithful County Mut. Fire Ins. Co., 243 S.W.2d 215 (Tex.Civ.App. 1951); Kansas City Life Ins. Co. v. Elmore, 226 S.W. 709 (Tex.Civ.App. 1920). See generally Appleman, Insurance Law and Practice, Section 7984 (1944); Couch on Insurance Section 31:123 (2d ed. 1961).
AFFIRMED ON DIRECT AND CROSS APPEALS.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.
NOTES
[1] Insurance companies doing business in this state fall into one of the following categories:

(1) Domestic companies organized under the provisions of Mississippi Code Annotated Section 83-19-1, et seq.
(2) Foreign companies licensed and admitted to do business under certificates of authority issued by the insurance commissioner and regulated under Mississippi Code Annotated Sections 83-1-23; 83-1-27; 83-21-3 through 83-21-13.
(3) Foreign companies who hold certifications as non-admitted insurers, but which are authorized to do business in this state, the category in which National Security falls.
(4) Nonlicensed and unauthorized insurance companies, who nonetheless solicit insurance business and issue policies in this state.
In its cross-appeal National Security argues its status as a non-admitted insurer, as opposed to an admitted foreign insurance company, makes a difference in this case on whether Southland held actual or apparent authority as its agent. Under our holding in Southeastern Fidelity Insurance Company v. Gann, 340 So.2d 429 (Miss. 1976), no such distinction should be made.